Gordon v. Cain, Mr. Eberle, haven't seen you in a while. Yes, good to see you. Probably lost count of how many appearances before the court. I have lost count, yes. The premise of our sufficiency claim is this. Although Ms. Commodore, the victim's sister, saw the face of Kendall Gordon in the masked man who fell on her lap shortly after her sister was murdered, her recorded interview proves rather conclusively, it's an interview of the course of the events of the crime, prove rather conclusively that what she has been trying to tell. These remarkable facts of testimony and witnesses, we've labored over that. Where is the Supreme Court law that the state has violated? That the state has violated? The state has violated the Jackson v. Virginia, viewing the evidence in light most favorable of the verdict. No reasonable juror could find the defendant guilty beyond a reasonable doubt. That is the error committed by the district court, and the error committed by the Court of Appeal is to unreasonably apply Jackson, which it did in several ways. Perhaps the, maybe not the most legally significant, but the one that sets the backdrop to all of the other unreasonable findings is this one, and I quote from the court, Darcelene Commodore recanted her identification for reasons she could not fully explain, but her explanation is rather simple. It couldn't hardly be clearer. She thought she saw Kendall Gordon in the man she thought was shot. When she heard the next day that Jesse Bibbins had been shot in her house and died shortly thereafter, she realized that she had made a mistake. This also reconciled the conflict she had in her mind with respect to the second perpetrator whom she believed was an older person, and Jesse Bibbins was only 18 years old, and he would have had to have been that second person if she was right about Kendall Gordon. Well, you say she recognized she had made a mistake. She said she had made a mistake, but I don't think the trial judge really believed that. That is correct. The trial judge did not believe that. Now, I'm somewhat impressed under the facts by the fact this is kind of an unusual situation. I know that sometimes eyewitness identifications, particularly when things happen quickly, can be suspect, but here what she stated, and please correct me if I get the record slightly wrong, she said that she recognized this man, that she had known him for several years, that they had shared a cell together in some kind of facility, and that she had known him or seen on other occasions, so it's a little bit harder to think that she would have misidentified him after looking him in the face. Well, let's maybe correct a little of that. She did not know him. There's no evidence that she knew him for years. She didn't share a cell with him. She met him at Central, well, maybe it was a cell, but she sat next to him at Central Lockup, and that's when she met him. It was not clear whether that was a year earlier or a few months earlier. Clearly, she was acquainted with him enough to recognize his face. Otherwise, we wouldn't be having a misidentification issue here to begin with, obviously, but as you say, I mean, I have listed a number of cases where people who I would say knew their, identified people they knew even better than the evidence shows that she knew him, have been found, have been exonerated by DNA evidence after being identified, so, but what we have in this case is we have an impossible, impossible inconsistency between what she described as happened and her claim that this was Kendall Gordon. It's utterly impossible. Why? Because she described very vividly, and this is one of the reasons why the during the course of the night, the course of the shooting, number two, that was dubbed by the detective, was the first one through the door. He's the one with the gun. He's the one who ordered everyone to, you know, to sit down and shut up. He's the one who was throwing the other one, dubbed number one, around from room to room. He's also the one who picked up Miss Commodore, dragged her from room to room, and the other one, number one, was the one who appeared to Miss Commodore as to having been shot, and he looked like he was shot. He couldn't get up. The other guy was picking him up, yelling at him to get up, threatening him, and so, you know, the fourth circuit somewhere says the evidence isn't clear whether, you know, whether she believed that number one was Jesse Bibbins, I mean, was Kendall Gordon, but there's no question, if you could listen to this tape, even the inferior quality tape that I provided this court, that she unquestionably identifies number one as Kendall Gordon. In fact, Detective Barrett Morton can be here and asking her, what is it about number one, or what is it that made you think that Kendall was the one who was shot? And then she goes through this litany, because number two was throwing him and yelling at him, and to quote it is to make it absolutely clear, what about their behavior made you think that Kendall was the one who was shot? And her answer was this, because the other boy, number two, picked the boy up that I know, Kendall, number one, whatever his name is, he was throwing him, and that's when I got to see his face, because the thing came off his face, because the other one, number two, was throwing number one out the room. I mean, there's no doubt that the person she thought was shot was the person she thought was Kendall Gordon. So then you find out that the person who, that a person was shot, person is dead, and it isn't my client. To help you a little more with this argument, what exactly, or how did you see the tattoos on the defendant's face? How visible? Well, when she recanted, she said, I told you about the tattoos, but not that I saw them. Correct. Because I remembered my mistake from Noah and Gordon himself. How visible were they? I didn't get that. Well, you know, I don't know how to help your argument. There are, this is an African-American dark man who has, I assume, green ink tattoos, little small tattoos right here. I don't. Well, in connection with that, let me say this, and of course this is just my reaction to it, and so when I read the narrative and I understand that she saw tattoos on the face, you know, my first reaction is, well, then how could there be a mistake? Yes. Because I'm thinking Mike Tyson-sized tattoo on the face. Right. Huge. Right. Because I think that may be the only person I know with a huge face tattoo, and so that's what I think, but when I looked at the photographs, these, the tattoo on Gordon's face, the tattoos, because there were several, but you correct me if I'm wrong, but my view is that they're all a little cross tattoo, and compared to a Mike Tyson-sized tattoo, these are pretty small. Is that right? Correct. All right. But also remember that while the state tries to argue that, well, you know, how could you be wrong if you saw the tattoos? And she insists that she didn't see the tattoos. She was, she knew, she saw, she thought she saw Kendall Gordon. She can describe Kendall Gordon. She does describe him. Then she looks at a picture of him with six people who have, five of them have crosses drawn on their faces. She says, and it's not contradicted at the trial by the detective at the trial, that I was describing him not as I saw him, but as I know him, and that's not contradicted in the trial. And, you know, ultimately the, I guess the only point about the size of the tattoos is for me, that recantation is less credible in my view, if the tattoos are large, but for her to say, because what she said is, is that I really didn't notice any tattoos on the night of the murder. When I gave my description of Kendall Gordon, this is what she says in the tape interview, when I gave my description of Kendall Gordon, that description was based on my recollection of the fact that he had tattoos, not on the fact that I observed tattoos on the night of the murder. Correct. Is that right? That's correct. All right. And, but, but, you know, the reason why we're here, or the reason that the district court found, found Mr. Gordon guilty was his belief that somebody had intervened and threatened her. And I like to talk about that because it probably hadn't discussed that well enough in the brief. And I'll take it from the point of the, of, of what the fourth circuit says and, and, and show you how both how the evidence doesn't support this and how the fourth circuit is most unreasonable. And here's what the fourth circuit says. Ms. Comedor's testimony concerning the possibility of reprisal against her based on comments she heard on the streets about what quote, people might do to her while not clear and indisputable testimony that her recantation was the result of fear of reprisal. We cannot say that the trial court was unreasonable and inferring from her testimony that this was the case. But among the problems with this analysis is that both courts make up the facts to reach their conclusions. For example, the district court, when it it's closing argument, the state is arguing that there's a, that somebody got to her and there's an objection that that's not an evidence. And here's what the court of the district court says, quote, she said that she talked to people in the process of making up her mind about the identification after she had made the identification. And then moments later when pronouncing the verdict, he said, she did talk to somebody before she changed her mind on her identification. This is just simply not true. She said she realized she made a mistake a day or two after, uh, you know, the event when she heard that Jesse Bibbins was shot and killed in her house. And there is no evidence anywhere in this record as to when she had heard about these rumors. Um, now the fourth circuit gets the facts wrong too, in a different way. She never said that the rumors involved what quote people and they, the court quotes word people as though this is what she said, uh, what people would do to her. What she said was, and the quote is she had heard rumors about what this person would do to her. If this person were to ever quote, get out of jail. And this seems like a minor point, but, um, it's not because if, if, as it seems to be the case that her uncontradicted testimony that she did not, was not threatened or ever felt threatened is to be disregarded. And in fact, assumed to be the opposite of the truth. Well, then this threat testimony only supports her claim of mistake because she has tried since immediately after this crime to get Mr. Gordon out of jail, which would only expose her to this threat. And, um, I think that bespeaks a motive. So when you say that you're assuming that when she's, when she said this person gets out, she was talking about Mr. Gordon getting in being the only person in jail related to this, because what was problematic for me with regard to that whole line of questioning, not just that, but it appears that she said at some point they killed the wrong person. Yeah. She said that I don't know. I have no idea what that means. Well, I don't either, but if I was a trial judge in a bench trial asking other questions like this judge did, and a witness said that somebody killed the wrong person, I might inquire about it. I really, I've tried to think about it and I just can't come up with it. Well, apparently the judge didn't ask any questions when she said it. Right. And the prosecutor didn't ask any questions about it. Correct. Maybe under the don't ask a question unless you know the answer already rule. I don't know. It just, it's problematic for me that they would conclude that, that the court would conclude that she had been subjected to some threat when she makes statements like that, where she says, if this person gets out of jail, but you're saying she was referring to Mr. Gordon. Yes. All right. And then she says they killed the wrong person. Right. And I'd be dying to know what that was all about. And apparently I'm the only person interested because nobody who was at the trial followed up. That's correct. All right. Well, uh, anyway, you don't know who killed the wrong person. I don't know anybody who got killed other than, uh, in this case, but the victim and Jesse Bibbins. Um, uh, but, uh, we think the evidence does not support the conviction and that the evidence actually affirmatively, uh, uh, suggest that Mr. Gordon is actually innocent of this crime. And, um, this is most likely his last stop on this six year ordeal. And we would ask this court to grant the writ and provide some measure of justice to Kendall Gordon and to Darcelene Commodore. Thank you. Thank you, Mr. Burley. You saved time for a bubble. Mr. Pickett. Judge Ridley, Judge Smith, Judge Graves. Good morning. May it please the court. My name is Andrew Pickett. I represent Warden Burrell Kane in this matter. Um, starting from, uh, what Judge Ridley said, he noted the remarkable facts of this case. The state's contention is that this is actually not a remarkable case at all. Um, this is a case in which a state trial court heard evidence. Some of that evidence and that testimony conflicted. That evidence was open to, uh, perhaps, multiple reasonable interpretations. And the trial court made weight in credibility determinations and rendered a verdict. Well, I wasn't too impressed with the trial court. The trial court, uh, wasn't even going to, uh, admit or accept the, uh, deposition then, which was given to the, to the prosecutor. Uh, it's the fact that, or it's the state of the law. Uh, the appellate judges, Judge, uh, Vance and Magistrate Good judges have all failed to find, you know, if the Supreme Court would say that, uh, an out-of-court statement not sworn to, uh, cannot be of itself the basis for our conviction. Um, I'd like that law, but the Supreme Court hadn't said that. That's the, the trouble that this habeas ADEPA, uh, test is so stiff, it's almost destroyed the habeas corpus jurisdiction of the federal courts. I was, uh, involved somewhat in the debate when this was going on, and I was disappointed that the court wrote it that way, but the court didn't. I mean, the Congress did, and the Congress did. I'm just sitting here helping you as much as I can. Well, and thank you, Your Honor. That was the point I was getting to next, is that, you know, obviously this court, as was the District Court below, is bound by the strictures that Congress put into the ADEPA, uh, and, uh, as far as, uh, as well as how the Supreme Court, uh, has interpreted those strictures ever since. Uh, Mr. Abelese said that this was the state violated, uh, Jackson versus Virginia in this case. Um, that is not, however, a complete argument because we have to look beyond just the ADEPA 2254, which makes it doubly deferential. The question, this is not a direct appeal, uh, and this court is not sitting, uh, you know, to do regular error review. The question is not simply, uh, whether the evidence was sufficient to prove, uh, Kendall Gordon's identity as a perpetrator beyond a reasonable doubt. Uh, the question isn't even whether, uh, that, uh, that any reasonable, uh, any reasonable fact finder could have disagreed that that was an unreasonable determination, whether, whether that determination by the state courts was objectively unreasonable. And you are right. It is a very high standard. Uh, the Supreme Court said in Harrington, even a strong case for relief does not mean that the state court's contrary conclusion is unreasonable. If the standard is difficult, uh, that is because it was meant to be. Now, viewing this case. Counsel, in this case, is there any other evidence other than the unsworn out of court statement? Is there any other single piece of evidence that connects this defendant to the crime? As far as physical evidence? No, Your Honor. Any kind? No. If you got any other evidence, doesn't matter to me what category it falls into, other than the unsworn out of court statement. Any other evidence? I'd love to hear about it. Darceline Commodore's statement to Detective Morton, uh, given a couple hours after murder is the sole evidence, uh, implicating Gordon in the murder of her sister, Patrice. That is true. Uh, however, uh, the state's that is not dispositive. The, you had, you know, you had that statement, you had her recantation at trial and it was up to the trial court. And, and the district and the trial judge apparently found that she recanted because she had been threatened. Is that right? The trial court found that there had been, yes, that someone essentially had intervened, uh, and that... Tell me all the evidence the trial court considered in support of its finding that there was a threat. Well, Darceline Commodore, uh, she testified, she did testify, it is true that she was never directly threatened, but that she was informed that she would be harmed if this person, uh, uh, was released from jail. And presumably the district court, the state district court, uh, presumed that that person referred to Gordon. Uh, also been told that, uh, Gordon and Bivens had killed the wrong person, which I believe she reasonably interpreted as referring to her. The, the issue here is not whether there is a direct threat. The issue is here is what, is whether the state court was objectively unreasonable in determining that based on what Ms. Commodore testified to, based on the fact that she had been informed that she could be a danger, could be harmed if this person was released, that the wrong person had been killed, whether that it was, whether that sufficed to make her as a reasonable person, uh, feel like recanting her testimony. I, I, I, I do not feel that it is a, I believe strongly that it is not a question of whether there's a direct, uh, explicit threat. Uh, threats can be as subtle as well as, as, as explicit. Whether there was enough that Ms. Commodore learned that it made her second guess her determination or second guess her decision to have identified Gordon, which she did. Uh, one, she said, you know, Detective Gordon, she was 100% certain of identification of Gordon. And, uh, I, I think that it fundamentally differ with, with Gordon as far as... Let's see if you and I agree. She gave a statement a few hours after the murder. Yes, sir. And then a couple of days later, she recanted. Well, at a trial she recanted, but she said a couple of days later... Well, a few days later she called and said, I, I identified the wrong person. Do we agree on that? That after, yes, she, she went to the attorney's office and said that she identified the wrong person. Yes. Now, and with regard to the threat, what evidence is there that she had a conversation with anybody, heard anything, talked to anybody about a threat prior to the contact with the district attorney where she said, I identified the wrong person? Well, I think it's, it can be reasonably determined the very fact that she learned that information. I mean, she had to learn it. It could be reasonably what? I think it could be reasonably concluded that, I mean, the very fact that she learned that information, someone had to have told that to her. Learn what information? The information that... About the threat? There could be harm and that they had killed the wrong person. She had to learn that from someone. No, my question is not who she learned it from. My question is when? Any evidence that she learned anything about that before she said, I identified the wrong person? About the threat? Any evidence of that? About when she heard some threat? Honestly, I could not tell you off the top of my head as far as time, whether there's anything that says exactly the time that she claimed. Well, we got the trial transcript. Is there anything in there about when she learned about the threat? Honestly, I cannot off the top of my head remember when she said when she learned. She had mentioned that, but the trial transcript, I mean, her testimony, and I think it's, again, a reasonable finding, it's pretty clear that her decision to recant was based on her learning of, you know, and if you want to call it a threat or information, some sort of, you know, level of intimidation, that that was what caused her to recant her testimony. Well, what she said was, as I understand it, she said, I mean, I'm just reading the quote as I have it here, say, like, if this person is going to get out of jail, this person going to do me this. So she felt like if he got free, I mean, that's the way I interpret it, that she would be harmed. If she testified he was acquitted or, I mean, and we could start speculating. Obviously, that's not proper to do, but I think it's reasonable for a trial-level judge to make certain inferences about those situations. It's not simply maybe even whether he's acquitted, but he may know other people, he has friends. These are things that we can't speculate about here, but the trial judge, I believe, was perfectly reasonable in making some inferences of that in her mind. And again, it's not whether it would have made you or I feel like recanting, it's not whether, it's whether this, you know, the judge's reading of this witness was that that was sufficient to make her recant. He was the one who was listening to her testimony. He had her, I mean, the Ormans Parish Courthouse, it's from there, there, and he made a determination that her decision to go back on her testimony or go back, rather, on her initial identification was not genuine. And that is a decision that is owed utmost deference. It was owed utmost deference by the district court and is owed utmost deference by this court on review. The fact, you know, the Supreme Court has said quite clearly the fact that there are other, you know, that there are facts that plausibly could be read to run counter to that or to lead to a different conclusion by itself does not suffice to supersede the state court decision as long as there is evidence supporting that, as long as that is not contradicted by the evidence, as long as that decision is not objectively unreasonable under 2254 D2 based in light of the evidence that was before that court. The district court, the state district court had both her testimony at trial and it had her police statement to Detective Morton. In that statement, and there are other reasons beyond the question of recantation, to believe the identification of Kendall Gordon was genuine. Her initial identification was correct besides her saying that she was 100% correct at first. This was, as you stated, as you asked opposing counsel, this was someone that she knew, she had met before. Beyond just what was mentioned during Mr. Averly's argument, she said that she saw Ken Gordon every day through her job, she was in retail, that she saw him every day, she knew him, she knew Jesse Bivens. I also think there are two really critical things to point out as far as the events of the night in question. One has to do with the question of the injury, supposed injury to the younger quote unquote perpetrator and there has to do with actually the question of younger and older. One of the key things that Gordon seizes on is this idea that the younger versus the older, that you know Jesse, rather that Kendall Gordon was the the younger perpetrator, the one who seemed to be injured and threw it around and Jesse Bivens was the older looking perpetrator. I mean they were roughly, I think they were 18 and 19, they were about a year apart I think in age actually. It's critical to note that in her statement to detective Morton, this is two hours after murder, she never once used the words younger and older to describe Bivens versus or in relation to Gordon. This is something that only first happens at trial, not once did her statement to detective Morton does she talk about one being older or one being younger. She only makes reference to Gordon being younger than her and to Bivens looking older in his lineup photo than he did on the day of the crime, but she never once describes them as younger and older. That is something that she came up with at trial and the trial court was correct and perfectly reasonable in discounting her sudden delineation or demarcation between younger and older. The other is the question, the issue of the injured quote unquote younger perpetrator, the one who seemed to be being thrown around. Again, and this is a reasonable termination of the trial court, there was really no evidence that's true. There is certainly true that she may have thought and she said, you know, he appeared to be injured, appeared to be shot, there was blood, but there's really no evidence that the state fourth circuit noticed on appeal of any of the perpetrators being shot. In fact, every single eyewitness testified that they only heard a single gunshot and we know for a fact that Patrice Commodore was shot in the head and killed. So it was certainly... So is the state not conceding that Jesse Bivens was one of the perpetrators in the home invasion? We're not conceding that he was one of the perpetrators, but there's no indication, I mean certainly he was found dead later, but there's no indication that he was shot. There were two nine millimeter shell casings found in the home, is that right? One was found, yes, one was found elsewhere I think in the back of the house or on the property that was found. Bivens was shot with a nine millimeter. They were both shot with nine millimeters. Commodore's sister was shot with a nine millimeter. Yes. Same gun. They were found using the same gun. However, as the witnesses testified, there was only one gunshot that they all heard in the house. It is entirely reasonable if the district court had found that Jesse Bivens was shot sometime after they left. It was also reasonable for the state trial court to conclude that the blood that was found, she said Jesse Bivens, or that Miss Commodore said that kind of Gordon appeared to have blood on him and that she transferred, he transferred the blood to her when he fell on her, but she also said that after, that both witnesses came tumbling out after Patrice, right in the vicinity of Patrice Commodore, who Miss Commodore, her sister said, was laying in a pool of blood. There were multiple reasonable interpretations of the facts for how blood got onto Jesse, onto Kendall Gordon. The trial, the state trial court chose one of those and as long as that was not an unreasonable interpretation, which it certainly isn't in light of the fact that every eyewitness testified they heard but one gunshot in the house, that that gunshot unquestionably, the only person we know for sure was shot in the house was Patrice Commodore and the fact that both Bivens and Gordon came tumbling out of the room and fell essentially in a pool of Patrice Commodore's blood, as long as that is not an unreasonable finding, the fact that there are factual scenarios that could lead, could have led the trial court to have found differently, is irrelevant under the ADPA. The finding that did come to was interpretation of facts under 2254 D2 was not objectively unreasonable, even if there were facts that plausibly could have led to a different finding, that is insufficient to overcome the finding it did make. This is kind of the theme of the state's argument here, this is really a case where Gordon is simply complaining that the state court should have found differently, that the facts should have been interpreted in a different light to lead to a different conclusion, but that simply under the ADPA, that simply is not sufficient to warrant habeas relief, whereas here you have a state court termination that although could have gone another way, was not objectively unreasonable based on the facts before it and based on the law, there is no warrant for federal court on habeas review to overturn that conviction. The, excuse me your honors, the court, federal courts must defer to reasonable findings of facts and even as I noted before, even a strong case relief does not necessarily mean that the state court's ruling that runs counter to that was unreasonable. Aren't you repeating yourself now Mr. Pickett? I am, which is probably a sign that I'm getting into my conclusion. I have about two and a half minutes left, so I think I'm going to get there. But this is not a case about whether the state court was right or wrong or incorrect or incorrect, this is about whether its determination was unreasonable beyond any possibility for fair minded disagreement. The fact that we're sitting here and we have quite fair mannered disagreement shows that this is not a case where no one can dispute, no fair minded person can dispute the fact that a state district or sorry, where there is a fair minded dispute as to whether the state court was unreasonable. So based on that and concerning the extreme deference that AEDPA puts or offers to state court decisions, that it demands of state court decisions, the state humbly asks this court to affirm the decision of love, denying the grant of habeas relief. Thank you very much, Your Honors. Thank you, Mr. Pickett. I believe you saved time for a vote. First, a minor point. I don't understand why the state insists on saying that she came up with the older younger thing at trial. Detective Morton testified at trial that Ms. Commodore quote, spoke about the two perpetrators in terms of older and younger and that she thought the first person in her house quote, looked older than the person in the photo. But anyway, I don't think in this case, Your Honor, we need a special rule, a special case for out of court identification not being sufficient in this case. If the only evidence we had in this case was her identification and then she said, I take it back, I made a mistake and that was it, then I wouldn't be arguing here that the evidence was insufficient. But what we have here is the fact that the statement, the recorded statement cannot be divorced from, the identification cannot be divorced from the probative value of that identification. It is not possible to believe that she was both correct in identifying Jesse Kendall Gordon and correct in very vividly describing two people, one healthy, the other one looked like he had been shot. The state makes a deal about only hearing one shot. My problem with that analysis is that once you reduce it, and I say reduce it, which is probably a bad word to use in a case with consequences as serious as these, but when you reduce it to a credibility determination, then it's difficult for me to understand why the trial judge isn't free to judge the credibility of the witness. She's live in the trial offering testimony, albeit testimony that she recants the statement that she gave earlier. You have the testimony of the detective who corroborates what she said in the statement. This is what she said. And if the trial judge is just free to make a credibility determination, why couldn't the trial judge just choose to believe what she said in the prior inconsistent statement? I don't think we're talking about credibility at all. We're not even talking about a recantation. The question isn't whether she's telling the truth when she says I made a mistake. I think the question in this particular case is whether that assertion under oath, which is the only thing we have under oath in this case, is utterly supported, thoroughly supported to the point where you can almost, you can't even say how could she be lying? How could Kendall Gordon, how could Jesse Bibbins have been shot in the neck and dying five minutes after leaving that house? And by the way, he was shot in the house. I mean, if he shot him outside the house, he either had to come back and bring in the shell casing. How could that person Jesse Bibbins be the one carrying her through the house wanting money and not worried about bleeding out while the other one, Kendall Gordon supposedly, looks like he's been shot? How could that really be Kendall Gordon and not be the shot person? We know Kendall Gordon wasn't shot at all. Therefore, she made a mistake. At best, you can't reasonably conclude that that identification was correct given that evidence. All right, thank you. Your case is under submission and of course we noticed that you're a court appointed and we always appreciate your willingness to take the appointments and your continued good service to the court. You've been doing this for a long time and the court appreciates it.